## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

XUNXIAN LIU,

       *Plaintiff,*

  v.

GEORGETOWN UNIVERSITY,

       *Defendant.*

</td><td>

Civil Action No. 22-157 (RDM)

</td></tr>
</table>

## <u>MEMORANDUM OPINION AND ORDER</u>

In this action Plaintiff Xunxian Liu, proceeding *pro se*, asserts claims against his former employer, Georgetown University ("the University"), under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the D.C. Human Rights Act, D.C. Code § 2-1402.61(a); and the Ninth Amendment.  Dkt. 8.  The University has moved to dismiss the complaint for failure to state a claim under any of these statutory or constitutional provisions.  Dkt. 12-1 at 6.

For the following reasons, the Court will **GRANT** in part and **DENY** in part the University's motion.

## I. BACKGROUND

### A.    Factual Background

For purposes of the University's motion to dismiss, the factual allegations set forth in the amended complaint (hereinafter "complaint") are taken as true.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

According to the complaint, Plaintiff Xunxian Liu was born in China and came to the United States to pursue a Ph.D. in biomedical sciences at the age of 36.  Dkt. 8 at 2–3 (Am.

Compl. ¶ 1).  The complaint alleges that China "is not a good environment to learn English" and that the relatively late age at which Liu came to the United States resulted in his "poor English." *Id.* at 3 (Am. Compl. ¶ 1).  Liu acquired his Ph.D. about five years after he arrived in the United States, and, in 2017, he was hired as a research specialist at a lab at the University.  *Id.* at 3, 4 (Am. Compl. ¶¶ 1, 4).  Liu began as a part-time employee and became a full-time research associate in April 2019.  *Id.* at 3 (Am. Compl. ¶ 1).  His "main research in the lab" focused on "mice projects" and, in particular, on the study of PLIN2, a "lipid-associated protein" that Liu alleges he "found" while conducting a study using three cohorts of mice.  *Id.* at 3, 4 (Am. Compl. ¶¶ 1, 6).

Liu alleges that the lab's director, Alexander Kroemer, permitted another researcher at the lab, Katrina Loh, to present data that he "produced" and his "ideas" on two occasions in early 2019, including at a professional conference in June 2019.  *Id.* at 6 (Am. Compl. ¶ 9).  Liu alleges that "PLIN2 appears" in the abstracts that accompanied these presentations, along with information that Liu describes as "my-generated data," including "mice/liver[] weights; diabetic tests; immune blots and immunohistochemistry."  *Id.* ; *see also* Dkt. 7-4 (abstract from first presentation); Dkt. 7-3 (abstract from second)[1].  According to Liu, Kroemer asked Loh to present because Kroemer thought Liu's "spoken English was poor."  Dkt. 8 at 7 (Am. Compl. ¶ 11).  Although Liu acknowledges that Kroemer was "right" on this point, he maintains that Kroemer's decision nevertheless amounted to discrimination on the basis of national origin and age because his poor English is attributable to his education in China and the relatively late age at which he

---

[1] Liu filed an errata with his corrected amended complaint, *see* Dkt. 8, but he did not re-file the exhibits attached to the uncorrected, amended complaint, *see* Dkts. 7-1 to 7-10.  Accordingly, the Court cites to Liu's corrected amended complaint but to the attachments to his uncorrected, amended complaint.

migrated to the United States. *Id.* The complaint does not provide an exact age for Loh but alleges that she is younger than 40 and that her national origin is "Malaysia." *Id.* at 3 (Am. Compl. ¶ 2). The complaint further alleges that Malaysia has "no diplomatic problem with the US" and so Loh's national origin provided her with an "advantage [in] learn[ing] English," particularly given that he "heard that she might have come to the US at age 3." *Id.*

Liu also alleges that Kroemer listed Loh as the first author on abstracts for which he should have been the first author. *Id.* at 7 (Am. Compl. ¶ 11). Although the complaint is not clear on this score, it appears these allegations refer to the same abstracts that Loh used in her presentations during the first half of 2019. *See* Dkt. 7-3; Dkt. 7-4. Kroemer listed Loh as the first author on these abstracts, according to the complaint, because he "wanted to foster Dr. Loh," explaining that she was "young" and had a "bright future." Dkt. 8 at 7 (Am. Compl. ¶ 11). Kroemer allegedly suggested that Liu, in contrast, was "old and that the first authorship [would] be useless for [him]." *Id*. This decision was particularly egregious, Liu maintains, because the "authorship sequence" turns on "researchers' contributions," and Liu's contributions to the abstract allegedly far exceeded Loh's. *Id.* at 7–8 (Am. Compl. ¶ 11).

When Liu complained about Kroemer's decision to allow Loh to "present[] [Liu's] results without [his] consent," the University allegedly retaliated against him by firing him. *Id.* at 9 (Am. Compl. ¶ 13). Liu acknowledges that at the time he was fired the University justified its decision based on three "incidents" that, according to the University, demonstrated his "poor performance"—namely, two research mistakes and one incident in which he was caught "taking a nap on [his] desk"—but he alleges that, in fact, he was terminated because he complained that Kroemer allowed Loh to present Liu's data. *Id.* at 9–10 (Am. Compl. ¶ 14). Liu further alleges that after his termination he emailed Kroemer and several others at the University to request the

date that he had generated.  *Id.* at 10 (Am. Compl. ¶ 17).  Liu also "requested to collect more

data" in order to make his "existing data meaningful," which would have led to a further

opportunity for publication.  *Id.* at 11 (Am. Compl. ¶ 18).  No one at the University responded to

his email.  *Id.* at 10–11 (Am. Compl. ¶¶ 17–18).

## B.    Procedural History

Liu, proceeding *pro se*, first filed suit against Kroemer and Loh in the D.C. Superior

Court in June 2020.  *See* Dkt. 12-2 at 2.[2]  That court granted Kroemer's motion to dismiss Liu's

suit on October 15, 2020.  *Id.* at 7.  The court construed Liu as raising claims for conversion,

trespass to chattels, and discrimination and held that first two of these claims failed to state a

claim and that Liu's discrimination claim could not proceed because Liu had a charge pending

with the D.C. Office of Human Rights ("OHR").  *Id*. at 5–7.

Liu, still proceeding *pro se*, then filed suit against the University in the D.C. Superior

Court in December 2021.  Dkt. 1 at 1 (Notice of Removal); *see also* Dkt. 1-1 (Superior Court

Complaint).   In this new complaint, Liu alleged that all of his pending charges against Kroemer,

Loh, and the University before the OHR have been "dismissed and/or withdrawn."  Dkt. 8 at 2

(Am. Complaint, Intro.).  The University removed this action to this Court on January 24, 2022,

on the ground that Liu's complaint asserted claims under federal law, including Title VII, the

ADEA, and the Ninth Amendment.  Dkt. 1 at 1–2.  The University moved to dismiss Liu's

complaint on January 31, 2022, Dkt. 5, but Liu promptly filed an amended complaint, Dkt. 7;

---

[2] The University attached an order from that D.C. Superior Court case to its motion to dismiss.
*See* Dkt. 12-2.  Although the Court generally does not consider matters outside the scope of the
complaint in resolving a Rule 12(b)(6) motion, "the decision of another court . . . is a proper
subject of judicial notice."  *Gumpad v. Comm'r of Soc. Sec. Admin*., 19 F. Supp. 3d 325, 328
(D.D.C. 2014).

Dkt. 8.  In light of the amended complaint, the Court denied the University's motion to dismiss the original complaint as moot.  Min. Order (Feb. 3, 2022).

The University then filed the pending motion to dismiss on February 15, 2022.  Dkt. 12. Liu filed his opposition on February 18, 2022, Dkt. 15, and the University filed its reply on February 25, 2022, Dkt. 18.[3]

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *see* Fed. R. Civ. P. 12(b)(6).  In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'"  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original).  The complaint need not include "detailed factual allegations," and a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v.*

---

[3] The docket reflects that Liu has several other motions pending.  These include a motion for summary judgment, Dkt. 11, and a motion seeking a hearing with a jury, Dkt. 21.  Subsequent filings, however, suggest that Liu intended what has been docketed as motion for a summary judgment is simply a pre-motion statement indicating his intention to file such a motion, rather than the motion itself.  Dkt. 17 at 1; *see also* Dkt. 16 at 1.  But to avoid any confusion, the Court will deny Liu's motion for summary judgment, if he in fact intended to file such a motion, as premature.  *See Fields v. Vilsack*, 207 F. Supp. 3d 80, 86 (D.D.C. 2016) ("[S]ummary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" (quoting *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012)).  For similar reasons, the Court will also deny Liu's motion for a hearing before a jury, Dkt. 21, as premature.  Finally, the Court concludes that Liu's remaining motions, *see* Dkt. 16; Dkt. 17, simply clarify Liu's prior filings and, as such, require no separate decisions from the Court.

*Twombly*, 550 U.S. 544, 555–56 (2007).  The Court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

A *pro se* complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  "This benefit is not, however, a license to ignore the Federal Rules of Civil Procedure," *Sturdza v. United Arab Emirates*, 658 F. Supp. 2d 135, 137 (D.D.C. 2009) (citation omitted), and thus a *pro se* complaint must "still 'present a claim on which the Court can grant relief' to withstand a Rule 12(b)(6) challenge," *Smith v. Scalia*, 44 F. Supp. 3d 28, 36 (D.D.C. 2014) (citations omitted).

### III. ANALYSIS

The University's motion to dismiss rests on three arguments.  First, the University argues that Liu's discrimination claims must be dismissed (1) because he fails to allege that he was terminated because of his national origin or age, and (2) because the opportunity to present data at a conference or to appear as the first author of a scholarly publication does not constitute a cognizable, adverse employment action. Dkt. 12-1 at 9.  Second, the University maintains that Liu's retaliation claims fail to allege (1) that Liu engaged in any statutorily protected activity or (2) that he suffered a material, adverse action.  *Id.* at 12.  Third, the University argues that Liu's Ninth Amendment/theft of property claim fails as a matter of law.  *Id*. at 15.  The Court will address each argument in turn.

### A.    Discrimination Claims

Liu's complaint is not the model of clarity, but the Court understands Liu to allege that

the University discriminated against him based on national origin and age, in violation of Title VII and the ADEA.  Dkt. 8 at 7–8 (Am. Compl. ¶ 11); Dkt. 12-1 at 9 (adopting the same understanding).

To the extent Liu claims that he was terminated in violation of Title VII or the ADEA, the Court agrees with the University that Liu fails to allege facts sufficient to state a plausible claim of discriminatory discharge.  To the contrary, as the University notes, Liu "alleges that he was terminated in retaliation for complaining about the authorship issue," and "at no time does he allege that he was terminated *because* of his age or national origin."  Dkt. 12-1 at 9 n.2.  Liu, in turn, offers no response to this contention in his opposition brief.  Because the Court reads Liu's complaint as the University does, and because the complaint draws no connection—direct or indirect—between Liu's national origin or age and his termination, the Court will dismiss Liu's claim for discriminatory discharge, if he in fact intends to assert such a claim, under Rule 12(b)(6) for failure to comply with Rule 8.

The focus of Liu's Title VII and ADEA discrimination claims, both in his complaint and in his opposition brief, turns on Kroemer's alleged decisions to permit Koh to present Liu's data and to list Koh as the first author on abstracts containing Liu's ideas.  *See* Dkt. 8 at 5–8 (Am. Compl. ¶¶ 9–12).  The University moves to dismiss both sets of claims on the ground that Liu does not allege "an actionable adverse employment action" related to his national origin or age. Dkt. 12-1 at 11.  As explained below, the Court is unpersuaded that dismissal is warranted on this ground, at least at this early stage of the proceeding.[4]

---

[4] Although the University's memorandum in support of its motion is not entirely clear, it does not appear that the University moves to dismiss Liu's claims relating to the data and first-authorship for failure to allege that Kroemer was motivated by Liu's national origin or age.

1.    *National Origin Discrimination*

Liu alleges that Kroemer discriminated against him due to his national origin by "allowing Loh to present . . . results" that he generated on two occasions in early 2019.  Dkt. 8 at 8 (Am. Compl. ¶ 11).  Kroemer made this decision, according to the complaint, because Liu's "spoken English was poor," *id.* at 7 (Am. Compl. ¶ 11), a fact that Liu alleges is attributable to his national origin, *id.* at 3 (Am. Compl. ¶ 1).[5]  Liu further alleges that "the presentation of data [at] an international meeting is a training opportunity" and that Kraemer's alleged refusal to permit him to make such a presentation therefore violated Title VII.  *Id.* at 8 (Am. Compl. ¶ 11).

Title VII bars discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of "that individual's race, color, religion, sex, or national origin." *Hinds v. Mulvaney*, 296 F. Supp. 3d 220, 233 (D.D.C. 2018) (quoting 42 U.S.C. § 2000e-2(a)) (quotation marks omitted).  To state a claim under Title VII, a plaintiff must allege that (1) that he is a member of a protected class, (2) that he suffered an adverse employment action, and (3) that the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).

The University's motion to dismiss Liu's data-presentation discrimination claim focuses solely on the second element, an adverse employment action.  The University maintains that "[a]n employee suffers a cognizable adverse employment action if he 'experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future

---

[5] The complaint, at times, suggests that this language-based decision constitutes age-based discrimination. *See* Dkt. 8 at 7 (Am. Compl. ¶ 11) ("[M]y poor spoken English is associated with national origin and age.").  The Court understands this allegation to relate to Liu's contention that his English is poor because he was born in China and came to the United States at a relatively late age, which the Court construes as single a claim of national origin discrimination under Title VII.

employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'"  Dkt. 12-1 at 10 (quoting *Czekalski v. LaHood*, 589 F.3d 449, 454 (D.C. Cir. 2009)). And because, the University says, Liu's complaint lacks any allegations of "an objectively tangible harm," his Title VII claim must be dismissed.  *Id.* at 10–11.

The D.C. Circuit, however, recently held—in an opinion that post-dated the briefing in this case—that a plaintiff need not allege that he suffered an "objectively tangible harm" to state a claim under Title VII.  *Chambers v. District of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022) (en banc).  Rather, Title VII requires only that "an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic," such as national origin.  *Id.* at 874–75 (quoting 42 U.S.C. § 2000e-2(a)(1)).  Following *Chambers*, so long as Liu's complaint alleges that the University discriminated against him with respect to the "terms, conditions, or privileges of employment" based on his national origin, 42 U.S.C. § 2000e-2(a)(1), his failure to allege an "objectively tangible harm," Dkt. 12-1 at 10–11, no longer provides a basis to dismiss his Title VII claim.

Here, the Court concludes that Liu has plausibly alleged that the University's denying him the opportunity to present the results of his research at a professional conference constitutes the denial of one of the "terms, conditions, or privileges of [his] employment" for purposes of Title VII,  42 U.S.C. § 2000e-2(a)(1).  "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (quotation marks omitted); *see also Chambers*, 35 F.4th at 874 (describing this provision as "capacious").  And even before *Chambers*, the D.C. Circuit made clear that employment actions may give rise to Title VII liability where those actions "adverse[ly] impact . . . the employee's potential for

career advancement." *Ortiz-Diaz v. U.S. Dep't of Hous. & Urb. Dev.*, 867 F.3d 70, 74 (D.C. Cir.

2017).  Liu alleges that "the presentation of data [at] an international meeting is a training

opportunity," Dkt. 8 at 8 (Am. Compl. ¶ 11), and the complaint contains sufficient allegations

that the Court may draw the reasonable inference that the opportunity to present the data and

conclusions allegedly derived from his own work would have advanced his career as an

academic researcher.

      Given that the D.C. Circuit decided *Chambers* after the briefing on the pending motion to

dismiss was complete, the Court offered the parties the opportunity to address the effect of that

decision on this case.  *See* Min. Order (June 22, 2022).  In its responsive brief, the University

maintains that, even after *Chambers*, "an adverse employment action arises from 'a *significant*

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing significant change in benefits."  Dkt.

23 at 2 (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  But that principle

derives from the Supreme Court's reliance "upon principles of agency law to hold that an

employer has no affirmative defense to vicarious liability under Title VII for a hostile work

environment when harassment by a supervisor 'culminates in a tangible employment action,'"

*Chambers*, 35 F.4th at 875–76 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765

(1998), and *Chambers* expressly distinguishes such claims from those brought under "Title VII's

general antidiscrimination provision," *id.* at 876 (alterations omitted) (quoting *Burlington N. &

Santa Fe Ry. Co. v. White*, 548 U.S. 53, 65 (2006)).  Because, *Chambers* explained, "[t]he thrust

of the hostile work environment cases is that an abusive working environment amounts to a

'*constructive* alteration[] in the terms or conditions of employment' only if harassment is severe

or pervasive[], . . . [t]hose cases have no bearing on a case in which an employer discriminates

against an employee with respect to the *actual* terms or conditions of employment." 35 F.4th at 877–78 (quoting *Ellerth*, 524 U.S. at 752). Indeed, *Chambers* expressly rejected reliance on the Supreme Court precedent to which the University directs the Court—*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)—because a later decision "put . . . to rest" the "notion" that *Ellerth*'s discussion of hostile work environment claims informed the scope of Title VII's general antidiscrimination provision. *Chambers*, 35 F.4th at 875–76 (discussing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

In light of this detailed, on-point analysis, the Court cannot agree with the University's assertion that, even after *Chambers*, Liu must "allege *significant* changes to his employment status" to survive a motion to dismiss. Dkt. 23 at 3. *Chambers* teaches, instead, that once a plaintiff has plausibly alleged that the University "has discriminated against [him] with respect to [his] 'terms, conditions, or privileges of employment' because of a protected characteristic, the analysis is complete"—"even if that discrimination is 'garden-variety'" 35 F.4th at 874–75, 79. As *Chambers* explains, "[t]he unadorned wording of the statute admits of no distinction between 'economic' and 'non-economic' discrimination or 'tangible" and 'intangible' discrimination," "[n]or does [it] distinguish between 'subtle' or 'overt' discrimination." *Id.* at 874.

That leaves the University's argument, found in its supplemental brief, that the "speaking opportunity" described in Liu's complaint was "unrelated to the terms and conditions of his employment as a Research Associate at the University." Dkt. 23 at 3. On this point, the University is correct that *Chambers* dealt with a more straightforward "term, condition, or privilege" of employment—"the transfer of an employee to a new role, unit, or location." 35 F.4th at 874. And it is true that, as a result, *Chambers* did not have occasion further to define the limits of that phrase for purposes of Title VII. Nor, so far as the Court can tell, have many

decisions focused on the contours of the operative statutory phrase, given the primacy of the objectively-tangible-harm inquiry prior to *Chambers*.  But even so, the Court cannot agree with the University's contention that Liu has failed plausibly to allege that the opportunity to present one's work at a professional conference constitutes a "term, condition, or privilege" of employment.

For purposes of the University's motion to dismiss, the Court must construe the complaint in the light most favorable to Liu and must draw all reasonable inferences in his favor. So construed, the Court concludes that Liu has plausibly alleged that the opportunity to present his or her research results at professional conferences—that is, to present and to take professional credit for one's own work—constitutes a "privilege" of employment as an academic researcher. *See* Privilege, Merriam-Webster, https://www.merriam-webster.com/dictionary/privilege (last visited June 30, 2022) ("privilege" is "a right or immunity granted as a peculiar benefit, advantage, or favor, *especially*: such a right or immunity attached specifically to a position or an office").  Liu makes precisely this point in his supplemental filing:  "I was [a] research associate in Alexander Kroemer's lab . . . [and] therefore, I ha[d] a right to present a study that is produced by my efforts."  Dkt. 24 at 2.  Although Liu may not amend his complaint in an opposition to a motion to dismiss, the Court agrees that this alleged "right" is fairly discernable from the allegations of his complaint.  In any event, at this early stage of the proceeding, the University bears the burden of showing that the complaint fails to state a plausible claim, and the Court cannot conclude that, as a matter of law, the loss of such an opportunity would inflict, at most, a "trivial harm."  Dkt. 23 at 4 n.3.

The Court pauses, however, to note the limitations of its holding.  The University— perhaps understandably, given the timing of *Chambers*—has focused on the (now-defunct)

objectively-tangible-harm requirement in arguing that Liu failed to allege an adverse

employment action.  Dkt. 12-1 at 10–11.  As the case progresses, the University remains free to

press whatever alternative arguments it sees fit on a motion for judgment on the pleadings or at

the summary judgment stage following discovery.  And, if this case does proceed to discovery,

that discovery will need to flesh out the exact significance of the lost opportunity to present and

its relationship to Liu's job responsibilities at the University before Liu will be able advance his

claims in this case.  But for now, the Court will deny the University's motion to dismiss Liu's

Title VII discrimination claim.

2.     *Age Discrimination*

In support of his age-based discrimination claim, Liu alleges that Kroemer did not ask

him to be first author on the abstracts that Koh presented because he is "old" and, therefore, "the

first authorship [was] useless" for him.  Dkt. 8 at 7 (Am. Compl. ¶ 11).  Instead, according to the

complaint, Kroemer listed Koh, who was not yet 40 years old, as the first author in order to

"foster" her as a "young" researcher with a "bright future."  *Id.*   This age-based decision, Liu

alleges, constituted discrimination in violation of the ADEA.  *Id.*   The University responds that,

like Liu's Title VII discrimination claim, his ADEA discrimination claim must be dismissed

because Liu fails to allege an objective harm stemming from Kroemer's decision.  Dkt. 12-1 at

11–12.  Because, the University maintains, the decision as to first authorship of an abstract is a

"judgment call," any harm Liu suffered amounts to a "subjective injur[y]" "that, on its face, is

not an adverse employment action."  *Id.* at 12.  And because an adverse employment action is

required for an ADEA claim in the same way it is for a Title VII claim, *Blackwell v. SecTek, Inc.*,

61 F. Supp. 3d 149, 161 (D.C. Cir. 2014), the University argues that Liu's age discrimination claim must also be dismissed, Dkt. 12-1 at 12.

The University's argument, as an initial matter, confuses the subjective intent of the alleged wrongdoer and the subject nature of the alleged injury.  No principle of law insulates subjective employment decisions from the antidiscrimination laws.  *Cf. Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988) ("We are also persuaded that disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests. In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices.") But even putting that mistake aside, the University once again relies on the now-defunct objectively-tangible-harm requirement.

*Chambers*, to be sure, dealt with Title VII, rather than the ADEA.  The D.C. Circuit's reasoning, however, relied principally on the text of Title VII, and the corresponding text of the ADEA tracks Title VII in material respects.  *Compare* 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.") *with* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.").[6]  The crux of *Chambers* was that once a plaintiff

---

[6] Unlike Title VII, the ADEA expressly defines "[t]he term "compensation, terms, conditions, or privileges of employment' [to] encompass[] all employee benefits, including such benefits provided pursuant to a bona fide employee benefit plan."  29 U.S.C. § 630(l).  But that definition

established that "an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic, the analysis is complete," because "*[t]he plain text* of Title VII requires no more." 35 F.4th at 874–75 (emphasis added).  "Any additional requirement, such as [a] demand for 'objectively tangible harm,' is a judicial gloss that lacks any textual support."  *Id.* at 875; *see also id.* at 878 (criticizing "the atextual requirement of 'objectively tangible harm'").  That same logic applies to the ADEA.

The Court, accordingly, must decide whether Liu has plausibly alleged that he was discriminated against because of his age "with respect to his compensation, terms, conditions, or privileges of employment," 29 U.S.C. § 623(a)(1), when Kroemer allegedly listed Koh as a first author on the abstracts rather than Liu.  Drawing all reasonable inferences in Liu's favor and construing the complaint liberally in light of his *pro se* status, the answer to that question is, once again, "yes."  "[C]ourts use Title VII standards to determine whether a plaintiff suffered an adverse action under the ADEA," *Blackwell*, 61 F. Supp. 3d at 161, and, as already explained, a plaintiff plausibly alleges an adverse employment action when the employer's conduct inhibits the plaintiff's "potential for career advancement," *Ortiz-Diaz*, 867 F.3d at 74.

The Court understands Liu to allege that Kroemer's lab generally listed the individual primarily responsible for the underlying work as the first author in its research abstracts.  *See* Dkt. 8 at 7–8 (Am. Compl. ¶ 11).  Liu alleges that while another researcher successfully declined

---

is often interpreted in the context of disputes over benefits like "life insurance, health insurance, and pensions[,] the costs of which are directly linked to age," *see*, *e.g.*, *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 426 (4th Cir. 2000), and, as such, it offers little insight regarding purported "benefits" or "privileges" like the first-authorship issue raised by Liu's allegations.  In any event, neither party argues that the ADEA and Title VII standards differ in relevant respects.

Kroemer's request to list Loh as the first author on his abstract, Kroemer gave Liu no such option and, instead, gave Loh first-authorship when he "should have been the first author." *Id.* at 7 (Am. Comp. ¶ 11). He explains that as a "research associate in Alexander Kroemer's lab," he had "a right to be the first author in the meeting abstract." Dkt. 24 at 2. Accepting Liu's allegations at true and drawing all reasonable inferences in his favor, the Court concludes that Liu has plausibly alleged that the opportunity to serve as first author on such an abstract—like the presentation opportunity at issue in his national origin discrimination claim—constitutes a "term, condition, or privilege" of his employment as an academic researcher. It is at least plausible that first authorship on an abstract would substantially support an academic researcher's "career advancement." *Ortiz-Diaz*, 867 F.3d at 74.

Here again, this is not to say that Liu will ultimately prevail on his claim. But it is the University's burden to show that Liu's complaint fails to state a claim, and its lone argument—that Liu's allegations are insufficient to establish an adverse employment action—fail at this early stage of the proceeding. The Court will, accordingly, deny the University's motion to dismiss Liu's ADEA claim.

## B.    Retaliation

Liu's allegations of retaliation focus on two separate incidents. First, Liu alleges that he was terminated because he sent an email to Kroemer complaining about the presentation and authorship disputes discussed above. Dkt. 8 at 9 (Am. Compl. ¶ 13). Second, he alleges that the University further retaliated against him by not responding to a post-termination email and trespassing upon his data. *Id.* at 10 (Am. Compl. ¶ 17).

The Court, like the University, understands Liu's complaint to assert these retaliation claims under the D.C. Human Rights Act. *See* Dkt. 12-1 at 12–13; Dkt. 8 at 9 (Am. Compl.

¶ 14) ("This discharge violates DC retaliation law . . . ."). That statute declares that it "shall" be

an "unlawful discriminatory practice to coerce, threaten, *retaliate against*, or interfere with any

person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on

account of having aided or encouraged any other person in the exercise or enjoyment of any right

granted or protected under this chapter." D.C. Code § 2-1402.61(a) (emphasis added). To

establish a *prima facie* case for retaliation under § 2-1402.61(a), Liu must allege the same

elements required for retaliation under Title VII: (1) that he was engaged in a statutorily

protected activity, (2) that he suffered a materially adverse action from their employer, and (3)

that there is a causal connection between the two. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C.

Cir. 2007); *see also Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 94 (D.D.C. 2007)

(comparing elements of retaliation under § 2-1402.61(a) with Title VII).

      1.    *Retaliatory Termination*

      The Court's analysis of Liu's first claim of retaliation—based on his termination from the

University's lab—begins and ends with the first element, a statutorily protected activity. This

element requires that Liu have opposed "alleged discriminatory treatment by the employer or

participat[ed] in legal efforts against the alleged treatment." *Globus v. Skinner*, 721 F. Supp.

329, 334 (D.D.C. 1989); *see also Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)

("While no 'magic words' are required, the complaint must in some way allege unlawful

discrimination, not just frustrated ambition.").

      Here, Liu alleges that he was terminated for sending an email to Kroemer in which he

stated that he was "very uncomfortable" because Loh presented "[his] results without [his]

consent." *See* Dkt. 8 at 9 (Am. Compl. ¶¶ 13 –14). But Liu attached the email in question to his

complaint, *see* Dkt. 7-7, and the University correctly observes that in that message Liu does not

oppose any type of unlawful discrimination.  Instead, he merely states that he was

"uncomfortable that [Loh] show[ed] [his] results without [his] consent" and declares that he

"must be the first author" for "the paper related to PLIN2."  *Id.*  These comments equate to little

more than "frustrated ambition" regarding the presentations and authorship disputes referenced

elsewhere in his complaint.  *Broderick*, 437 F.3d at 1232.  Objections of this type, unconnected

to any asserted violation of the antidiscrimination laws, do not amount to statutorily protected

activity.  The Court, accordingly, concludes that Liu's complaint fails to state a retaliation claim

pursuant to D.C. Code § 2-1402.61(a).

     2.    *Post-Termination Retaliation*

    Liu's second retaliation claim—that the University retaliated against him by trespassing

upon his data—also fails.  Because the precise nature of Liu's claim is difficult to discern, the

Court will quote his relevant allegation is full:

> On 11/24/2020, I sent an email to Dr. Kroemer, Mr. Michael Smith (Director,
> Affirmative Action, Office of Institutional Diversity, Equity & Affirmative
> Action-IDEAA, Georgetown University) and Ms. Mary Schmiedel (Senior
> Director, Office of Research Oversight, Main Campus & Medical Center
> Conflict of Interest Officer Research Integrity Officer, Georgetown University)
> to request my-generated ferroptosis data (sentence 13 and my GU email to
> Kromer on 6/24/2019. Since I cannot access to GU email any more, another
> discovery subject is to retrieve the email) for a possible publication with GU
> authorship (Attachment 9), but they never give me any response, which is
> trespass of my data, defined by Your Honor's Order of 10/15/2020, page 4,
> paragraph 2 in the case: 2020 CA 02729B.

Dkt. 8 at 10 (Am. Compl. ¶ 17).  The Court cannot determine which order Liu has in mind or

how such an order might bear on his claim.

    The University construes this allegation to allege that the University retaliated against

him by failing to provide him with the courtesy of even responding to his email.  Reading the

complaint in this manner, the University then convincingly argues that "[i]gnoring an email from

a terminate employee is exactly the sort of 'petty slight[]' that would not deter an employee from making a claim of discrimination, and [thus] Plaintiff's second retaliation claim must be dismissed."  Dkt. 12-1 at 14.  To be sure, "the universe of cognizable retaliatory actions is broader than that of discriminatory actions, as a reasonable worker could be discouraged from reporting abuse by actions [that] might not themselves be considered abusive."  *Swann v. Officer of the Architect of Capitol*, 73 F. Supp. 3d 20, 26–27 (D.D.C. 2014) (citing *White*, 548 U.S. at 70–71).[7]  But this framework has limits, and "trivial harms" are insufficient to constitute adverse actions.  *White*, 548 U.S. at 68.  The universe of "trivial harms" has been found to include threatened suspensions, letters of reprimand, unsatisfactory performance reviews (at least where such reviews are not "attached to financial harms"), and "profanity-laden yelling."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198–99 (D.C. Cir. 2008) (collecting cases).  Measured against this standard, the Court agrees with the University that the complaint does not plausibly alleges that University officials' purported failure to respond to an email constitutes a materially adverse action.

An alternative reading of Liu's complaint, however, avoids this pitfall, although it does not avoid other, equally problematic concerns.  Giving Liu the benefit of the doubt, the Court might read his complaint to allege, not simply that the University failed to respond to his email, but that he had a "right to use" the data that he generated while employed at the University and that the University wrongfully kept that data in retaliation for his "complaint."  Dkt. 8 at 11 (Am.

---

[7] Because *Chambers* expressly distinguished retaliation claims from discrimination claims in its discussion of Title VII's scope, *see* 35 F.4th at 876–77, the Court concludes that its analysis does not alter the standard for adverse employment actions in the context of a retaliation claim.  *Accord Harbour v. Univ. Club of Wash.*, No. 21-cv-2047, 2022 WL 2304033, at *6 n.4 (D.D.C. June 27, 2022) (holding that because *Chambers* "expressly distinguished discrimination and retaliation claims" that decision "in effect preserv[ed] case law" regarding what constitutes a "materially adverse event for the purposes of the latter").

Compl. ¶ 18).  But, even if construed in this manner, Liu's second retaliation claim runs into the same difficulty posed by his first retaliation claim: he fails to allege that he ever objected or complained that he was subjected to any discriminatory treatment.  Absent some identifiable opposition to "alleged discriminatory treatment by the employer or participat[ion] in legal efforts against the alleged treatment," Liu's retaliation claim fails as a matter of law.  *Globus*, 721 F. Supp. at 334.

Finally, to the extent that Liu intends to claim that the University ordinarily would have provided him with access to the data that he generated while employed in Kroemer's lab, but that it refused to do so because Liu had filed a complaint with the OHR, his claim might survive a motion to dismiss.  The difficulty is that, as drafted, the complaint does not put the University on reasonable notice of such a claim, as evidenced by the fact that neither the University nor Liu raises the possibility of any such claim in briefing the instant motion to dismiss.  And even pro se litigants must comply with Rule 8's requirement that they provide a "short and plain statement of [his] claim," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555).  The Court will, accordingly, dismiss Liu's second retaliation claim for failure to state a claim but him grant leave to file an amended complaint, if this theory is, in fact, the retaliation claim that Liu intends to allege and if he has a factual basis for such a claim.

## C.    Ninth Amendment/Trespass Claims

Liu alleges that his "right to know and [his] right to present [his] intellectual property," Dkt. 8 at 6 (Compl. ¶ 9), and his "right to use [his] data," are all "protected by the Ninth Amendment" of the U.S. Constitution.  Dkt. 8 at 6, 11 (Am. Compl. ¶¶ 9, 18).  He cites no authority, however, for that novel proposition, nor is the Court aware of any.  is merely "a rule of

construction" and that it does not establish "a substantive basis for a civil rights claim." *Rynn v. Jaffe*, 457 F. Supp. 2d 22, 26 (D.D.C. 2006) (collecting cases).   Finally, even if the Ninth Amendment might be read to affirm the existence of certain "other" substantive rights "retained by the people," U.S. Const. amend. IX, Liu offers no basis to conclude that the right to present data at a professional conference or the right to use data collected while employed by a private University are among the rights "retained by the people." *Cf. Griswold v. Connecticut*, 381 U.S. 479, 490 (1965) (Goldberg, J., concurring) (observing that statements made by James "Madison and [Joseph] Story make clear that the Framers did not intend that the first eight amendments be construed to exhaust the basic and fundamental rights which the Constitution guaranteed to the people").   The Court, accordingly, concludes Liu has failed to state a claim under the Ninth Amendment to the Constitution. *Cf. Robinson v. Pilgram,* No. 20-cv-2965, 2021 WL 5987016, at *8 (D.D.C. Dec. 17, 2021).

This, then, leaves Liu's claim that the University "trespass[ed] o[n] [his] data" when University officials failed to respond to his post-termination email requesting the data that he generated.  Dkt. 8 at 10 (Am. Compl. ¶ 17).  The University understands this allegation to allege a separate claim for trespass to chattels under D.C. law. *See* Dkt. 12-1 at 15.  This strikes the Court as a generous reading of Liu's complaint, even taking into account the liberal pleading standard afforded *pro se* litigants.  But, to the extent the University's understanding is correct, the Court agrees that Liu has failed to state such a claim, for largely the same reasons as the D.C. Superior Court found Liu had failed to allege that claim. *See* Dkt. 12-2 at 5–6.[8]  Most notably, trespass to chattels requires that a plaintiff plausibly allege that the tortfeasor "intentionally (a)

---

[8] The Court notes that, although the D.C. Superior Court appears to have issued a final decision on the merits of this claim, *see* Dkt. 12-1 at 5–6, the University does not seek dismissal of any such claim under the doctrines of res judicata or collateral estoppel.

dispossess[ed] another of the chattel, or (b) us[ed] or intermeddl[ed] with a chattel in the possession of another," *Hornbeck Offshore Transp., LLC v. United States*, 563 F. Supp. 2d 205, 212 n.8 (D.D.C. 2008) (quoting Restatement (Second) of Torts § 217), where "[t]he definition of chattel includes real or personal property," *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 20 (D.D.C. 2014).

Liu's complaint does not address any of these elements.  Most fundamentally, and even assuming that the data at issue constitutes "chattel" for purposes of this analysis, the Court agrees with the D.C. Superior Court's conclusion that "[t]here are no allegations that defendant Kroemer"—or any other University official—"corrupted or otherwise interfered with [Liu's] control over the data."  Dkt. 12-2 at 6.  Liu alleges only that the University officials failed to respond to his email: "[T]hey never g[ave] me a response, which is trespass of my data."  Dkt. 8 at 10 (Am. Compl. ¶ 17).  But Liu never alleges that he owned (or held any other legal interest in) the data that was generated while he worked in Kroemer's lab and, if so, the basis for that ownership (or other legal) interest.  Without any allegation that University officials "dispossess[ed]" him of data—that is, that they took data that was in his lawful possession when he was terminated—or that they "us[ed] or intermeddl[ed]" with data in his lawful possession, *Hornbeck Offshore Transp.*, 563 F. Supp. 2d at 212 n.8, Liu cannot make out a claim for trespass to chattel.  Accordingly, the complaint fails to state a claim for trespass to chattels.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the University's motion to dismiss, Dkt. 12, is **GRANTED** in part and **DENIED** in part.  The University's motion to dismiss Liu's claims of national origin discrimination under Title VII and age discrimination under the ADEA is **DENIED**.  In all other respects, however, the University's motion is

**GRANTED** and the remainder of Liu's complaint is **DISMISSED** without prejudice.

       **SO ORDERED**.


                               /s/ Randolph D. Moss
                               RANDOLPH D. MOSS
                            United States District Judge


Date:  July 6, 2022