UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| XUNXIAN LIU,<br><br>    *Plaintiff,*<br><br>  v.<br><br>GEORGETOWN UNIVERSITY,<br><br>    *Defendant.* | Civil Action No. 22-157 (RDM) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Xunxian Liu, proceeding *pro se*, commenced this action against his former employer, Georgetown University, bringing claims under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the D.C. Human Rights Act, D.C. Code § 2–1401.01 *et seq.* Dkt. 51. Since filing his original Complaint in 2021, Dkt. 1, Liu has filed an Amended Complaint, Dkt. 7, and a Second Amended Complaint, Dkt. 51.[1] In his most recent complaint, Liu alleges that the University (1) discriminated against him based on his race, nationality, sex, and age when his supervisor permitted someone other than Liu to present data at two conferences and listed that other researcher as the first author on the associated abstracts, and (2) unlawfully retaliated against Liu for complaining about this

---

[1] Before the Court granted him leave to file his Second Amended Complaint, Liu filed several motions for leave to amend that failed to comply with the Court's rules, *see* Min. Order (Oct. 5, 2022); Min. Order (Oct. 7, 2022), or that he withdrew after further consideration. He ultimately filed a Motion for Final Revision of Pleadings, Dkt. 50, which the Court granted, *see* Min. Order (Oct. 11, 2022).

mistreatment by firing him and by failing to respond to his post-termination requests for access to the data that he generated while working as a research associate in a University lab.

Now before the Court is the University's renewed motion for judgment on the pleadings. Dkt. 58.  For the following reasons, the Court will **GRANT** the University's motion.

## I. BACKGROUND

**A.   Factual Background**

For purposes of the University's motion for judgment on the pleadings, the factual allegations set forth in the Second Amended Complaint (hereinafter "Complaint") are taken as true.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  The Court will also consider documents that are referenced in the Complaint and that are "integral" to Plaintiff's claims.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)); *Lamb v. Millennium Challenge Corp*., 573 F. Supp. 3d 346, 350, 352 (D.D.C. 2021) (quoting same).  Because Plaintiff is proceeding *pro se*, the Court will endeavor to construe his allegations liberally.  *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402–03 (2008).

Plaintiff Xunxian Liu was born in China and came to the United States to pursue a Ph.D. in biomedical sciences at the age of 36.  Dkt. 51 at 5 (Second Am. Compl. ¶ 1).  Liu completed his prior degrees at a university in China, which, according to Liu, is the cause of his "poor English."  *Id.*  Liu acquired his Ph.D. about five years after he arrived in the United States, and, in 2017, he began working as a "temporary" "Research Specialist" in the lab of Dr. Alexander Kroemer at the University.  *Id.*  In April 2019, Liu was offered a position as a "Research Associate" in Kroemer's lab, which was "supported by" Kroemer's "R21 funding."  *Id.*  According to Liu's offer letter, the first three months of his employment were "probationary."

*Id.* at 12–13 (Second Am. Compl. ¶¶ 16–17); *see also* Dkt. 55-2 at 3; Dkt. 38-1 at 5.  His "main research in the lab" focused on "mice projects"—specifically, the study of PLIN2, a "lipid-associated protein" that Liu alleges he "found."  Dkt. 51 at 5–6 (Second Am. Compl. ¶¶ 1, 6).

Liu worked alongside two other lab employees.  The first was Katrina Loh, M.D., who was "32 or 33" years old at the time, "female," and from Malaysia.  Dkt. 51 at 5 (Second Am. Compl. ¶ 2).  Loh, who had a medical degree, was a "Medical Fellow" in the lab, and her salary was paid by "Children's National Hospital."  *Id.*  Like Liu, Loh worked on "mouse projects."  *Id.*  The second researcher was Jiman Kang, Ph.D., who was "not [yet] 40" at the time, "male," and from "Korea."  *Id.* at 5 (Second Am. Compl. ¶ 3).  Kang worked as a "Research Assistant" and was "paid by Kroemer's R1 funding, which supports human research."  *Id.*

Liu's Complaint against the University is difficult to parse, but it appears to arise from four related incidents.  First, Liu alleges that in June of 2019, he learned that Loh had presented an abstract and poster containing his "produced data" and his "ideas" at the Children's Hospital and later at a "transplant conference."  Dkt. 51 at 7–8 (Second Am. Compl. ¶ 9).  Liu further alleges that Loh was listed as "first author" on the poster.  *Id.*  He alleges that those presentations "seriously damage" his "right/privileges associated with [his] position in the lab," because a researcher should "present a study and [be] first author of it" where that researcher has "played major roles."  *Id.*

According to Liu, Kroemer "wanted to foster Loh, a young woman."  Dkt. 51 at 8 (Second Am. Compl. ¶ 10).  Kroemer accordingly "let Loh be the first author in [Liu's]-caused study, leading to her presenting [Liu's] data, discriminating in age, national origin and sex."  *Id.* at 10 (Second Am. Compl. ¶ 12).  Liu further alleges that "Kroemer depriving a training opportunity of [his] and the first authorship in the poster is intentional racial discrimination, by

virtue of Section 1981" because Kroemer had previously "given the first authorships" to unnamed white individuals who "played major roles in two studies." *Id.* at 9 (Second Am. Compl. ¶ 11).

As for the second incident, Liu alleges that Kroemer also failed to seek his consent before allowing Loh to present the data. Liu alleges that this "might" constitute "sex and/or age discrimination." Dkt. 51 at 8 (Second Am. Compl. ¶ 10). To illustrate, Liu compares himself to Kang, who was "Korean, not [yet] 40 in 2019." *Id.* at 16 (Second Am. Compl. ¶ 23). Liu alleges that Kroemer similarly asked Kang to "let Loh be the first author in Kang's study." *Id.* at 8 (Second Am. Compl. ¶ 10). Apparently, Kang declined this request, explaining that he felt "uncomfortable." *Id.* Thus, according to the Complaint, "Kroemer asked Kang to give up his first authorship, but never let [Liu] know [his] first authorship had been already gifted to Loh, which is the triple age/national origin discrimination in the incident." *Id.* at 9 (¶ 10).

The third incident arises from Liu's termination. Liu states that, in early June of 2019, he "sent an email to Dr. Kroemer" explaining that he felt "very uncomfortable" after he "found Loh presented [his] results without [his] consent." Dkt. 51 at 11 (Second Am. Compl. ¶ 13). Liu alleges that Kroemer "did not address" Liu's complaint. *Id.* Liu then received a termination letter later that month. *Id.* According to Liu, the termination letter was "obviously" an act of "reprisal" for Liu's "complaint email." *Id.*

Liu admits in his complaint, however, that his termination letter correctly stated that he "mistook a patient name with an assay report," "used wrong reagents in a new experiment," and "[took] a nap on [his] desk" during working hours. *Id.* at 12 (Second Am. Compl. ¶ 15).[2] The

---

[2] Liu also asserts that the D.C. Unemployment Office agreed that the "reason" he was fired is "because [he] sent a complaint email." Dkt. 51 at 12 (Second Am. Compl. ¶ 15) (citing Dkt. 7).

termination letter itself—which Liu attached to his first amended complaint, Dkt. 7-8, and incorporates by reference into his operative complaint, Dkt. 51 at 11 (Second Am. Compl. ¶ 13) (referencing Dkt. 7-8)—further explains that Liu's termination was also based on "mislabeling of samples, missing mouse weighs for 2 weeks," and his "aggressive communication style with other lab members." Dkt. 7-8 at 1. Liu does not dispute the factual accuracy of the letter but alleges that these reasons were "inadequate for firing." Dkt. 51 at 12 (Second Am. Compl. ¶ 15).

Liu claims that his termination constituted "discrimination in national origin and age," because Kang also voiced discomfort regarding Loh being listed as first author, yet "[Kang] is still hired," whereas Liu "h[as] been fired." *Id.* at 16 (Second Am. Compl. ¶ 23). Shortly after he was terminated, Liu filed a complaint with the D.C. Office of Human Rights ("OHR") and the EEOC, alleging that the University "discriminated against [him] based on [his] age and national origin when [he] was terminated on June 27, 2019." Dkt. 30-5 at 1 (charge form); *see also* Dkt. 71-1 (letter to OHR).

The fourth and final incident relates to Liu's efforts to obtain his "generated ferroptosis data" from the University following his termination. Dkt. 51 at 18–19 (Second Am. Compl. ¶ 28). Liu alleges that, several months following his termination, he emailed Kroemer and others at the University to request "use of the data," but the University never responded. *Id.* at 19 (Second Am. Compl. ¶ 28). In Liu's view, the University's failure to send him these data is an act of retaliation in response to his "activities . . . in OHR," because "anyone has [a] right to use ones'-produced data [from] a former employer for justified reasons in the US." *Id.* at 20 (Second

---

But this allegation is controverted by the letter Liu cites in support, Dkt. 7-9 at 1. The letter merely states that the University declined to provide evidence to the Unemployment Office that Liu engaged in misconduct, and Liu was therefore not disqualified from receiving unemployment benefits. *Id.*

Am. Compl. ¶¶ 32–34).  Liu further asserts that the University's non-response to his request for these data constitutes "intentional racial discrimination."  *Id.* at 21 (Second Am. Compl. ¶ 36).

## B.  Procedural History

Liu, proceeding *pro se*, first filed suit against Kroemer and Loh in the D.C. Superior Court in June 2020.  *See* Dkt. 12-2 at 2.[3]  That court granted Kroemer's motion to dismiss Liu's suit on October 15, 2020.  *Id.* at 7.  The court construed Liu as raising claims for conversion, trespass to chattels, and discrimination and held that first two of these claims failed to state a claim and that Liu's discrimination claim could not proceed because Liu had a charge pending with the D.C. Office of Human Rights ("OHR").  *Id.* at 5–7.

Liu, still proceeding *pro se*, then filed suit against the University in the D.C. Superior Court in December 2021.  Dkt. 1 at 1 (Notice of Removal); *see also* Dkt. 1-1 (Superior Court Complaint).  In this new complaint, Liu alleged that his pending charges against Kroemer, Loh, and the University before the OHR have been "dismissed and/or withdrawn."  Dkt. 1-1 at 4.  The University removed this action to this Court on January 24, 2022, on the ground that Liu's complaint asserted claims under federal law, including Title VII, the ADEA, and the Ninth Amendment.  Dkt. 1 at 1–2.  The University moved to dismiss Liu's complaint on January 31, 2022, Dkt. 5, but Liu promptly filed an amended complaint, Dkt. 7; Dkt. 8.  In light of the amended complaint, the Court denied the University's motion to dismiss the original complaint as moot.  Minute Order (Feb. 3, 2022).

The University then filed a motion to dismiss Liu's amended complaint on February 15,

---

[3] The University attached an order from that D.C. Superior Court case to its motion to dismiss. *See* Dkt. 12-2.  Although the Court generally does not consider matters outside the pleadings, "the decision of another court . . . is a proper subject of judicial notice."  *Gumpad v. Comm'r of Soc. Sec. Admin.*, 19 F. Supp. 3d 325, 328 (D.D.C. 2014).

2022.  Dkt. 12.  On July 6, 2022, the Court issued a Memorandum Opinion and Order granting in part and denying in part the University's motion to dismiss Liu's first amended complaint.  *See* Dkt. 25 at 22–23.  The Court construed Liu's complaint as asserting claims of discriminatory discharge, discrimination in the terms and conditions of employment based on age and national origin, retaliatory discharge, post-termination retaliation, trespass, and infringement of Ninth Amendment rights.  *Id.* 6–8, 13, 17–18, 20.  The Court dismissed all of Liu's claims, without prejudice, except for Liu's claims of national origin discrimination under Title VII and age discrimination under the ADEA.

      First, the Court dismissed Liu's claim of discriminatory discharge because Liu alleged that "'he was terminated in retaliation for complaining about the authorship issue,' and 'at no time d[id] he allege that he was terminated *because* of his age or national origin.'"  Dkt. 25 at 7 (quoting Dkt. 12-1 at 9 n.2) (emphasis in original).  The Court then dismissed Liu's claim of retaliatory discharge on the grounds that Liu failed to allege that he had engaged in any statutorily protected activity preceding his discharge.  *Id.* at 17.  Liu's post-termination retaliation claim failed for two reasons.  First, to the extent the claim merely alleged that the University demonstrated a lack of "courtesy" by ignoring Liu's email, the Court explained that such a "petty slight[]" did not rise to the level of  "a materially adverse action" sufficient to support a retaliation claim.  *Id.* at 19.  Second, to the extent Liu might have intended to allege that he had right to the data, and that the University's failure to respond was thus more than a "petty slight," his retaliation claim would still fail because Liu did not allege a connection between the University's non-response and any statutorily protected activity.  *Id.* at 20.  The Court noted that "to the extent that Liu intends to claim that the University ordinarily would have provided him with access to the data that he generated while employed in Kroemer's lab, but that

it refused to do so because Liu had filed a complaint with the OHR, his claim might survive a motion to dismiss." *Id.* But Liu's complaint, as drafted, could not plausibly be read to assert this claim. Finally, the Court dismissed Liu's claim under the Ninth Amendment and his claim of trespass to chattel. *Id.* at 20-22.

The Court, however, concluded that, "at least at this early stage of the proceeding," Liu's claims of national origin and age discrimination under Title VII and the ADEA should proceed. Dkt. 25 at 7. The University had moved to dismiss those claims only on the ground that Kroemer's alleged selection of Loh instead of Liu as the first author was not "an actionable adverse employment action." *Id.* (quoting Dkt. 12-1 at 11). In light of the D.C. Circuit's intervening decision in *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022), however, the Court was persuaded that the opportunity for Liu to present his data and to appear as the first author were "privileges" of employment under Title VII and the ADEA. *See* Dkt. 25 at 8–16. Accordingly, the University's denial of these privileges amounted to an adverse employment action. *See id.* Notably, the University did not argue that Liu's claims should be dismissed "for failure to allege that Kroemer was motivated by Liu's national origin or age." *Id.* at 7 n.4. But the Court explained that, "[a]s the case progresses, the University remains free to press whatever alternative arguments it sees fit on a motion for judgment on the pleadings." *Id.* at 13.

The University then filed an answer to Liu's amended complaint and moved for judgment on the pleadings. *See* Dkts. 30, 35. In response, Liu filed a long series of motions to amend his complaint again. Dkts. 26, 27, 33, 38, 44, 45, 46. The University opposed these motions, Dkts. 32, 34, 42, but the Court permitted Liu "to file one last amended complaint" so that "the Court can address the sufficiency of Plaintiff's claims via a single complaint and a single motion for

judgment on the pleadings," Minute Order (Oct. 7, 2022).

Several days later, Plaintiff filed a single motion to amend his complaint, Dkt. 50, which the Court deemed filed and docketed as Liu's second amended complaint, Dkt. 51; *see* Minute Order (Oct. 11, 2022). Liu's second amended complaint renews his claims of national origin discrimination and age discrimination in the terms and conditions of employment, discriminatory discharge, retaliatory discharge, and post-termination retaliation, and asserts new claims of sex and race discrimination. Liu did not renew his claims under the Ninth Amendment or for trespass to chattel.

Now before the Court is the University's motion for judgment on the pleadings, Dkt. 58, Liu's opposition, Dkt. 60, and the University's reply, Dkt. 64.[4]

## II. LEGAL STANDARD

"When evaluating a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), courts employ the same standard that governs a Rule 12(b)(6) motion to dismiss." *McNamara v. Picken*, 866 F. Supp. 2d 10, 14 (D.D.C. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged need not be "detailed," but they must "allow[] the court to draw the reasonable inference that the defendant is liable for the

---

[4] In the course of briefing the University's motion for judgment on the pleadings, the parties filed several other motions that are relevant to resolving the instant motion. Liu filed a motion to strike the exhibits attached to the University's amended answer, Dkt. 54, which the Court denied, Minute Entry (Nov. 30, 2022). Liu also moved to file a surreply, to which he attached exhibits showing the dismissal of his EEOC charge on October 25, 2022. Dkt. 66. The University then filed a motion withdrawing its argument that Liu failed to exhaust his administrative remedies as to his claims of national origin discrimination under Title VII and age discrimination under the ADEA. Dkt. 67; *see also* Dkt. 58-1 at 41–42 (Argument IV). Accordingly, the Court will not consider these arguments.

misconduct alleged;" it is not enough to raise the "sheer possibility that a defendant has acted

unlawfully." *Id.* (quotation marks and citation omitted).  Accordingly, "[a] pleading that offers

'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not

do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

   The Court assumes the truth of the complaint's factual allegations, "even if doubtful in

fact, and [draws] all reasonable inferences in favor of the plaintiff." *Townsend v. United States*,

236 F. Supp. 3d 280, 296 (D.D.C. 2017) (citing *Twombly*, 550 U.S. at 555; then citing *Nurriddin*

*v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016)).  The Court does not, however, assume the truth

of legal conclusions asserted within the complaint, *Iqbal*, 556 U.S. at 678, nor need it "accept

inferences drawn by [a] plaintiff[ ] if such inferences are unsupported by facts set out in the

complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

   Moreover, "[w]hen evaluating a motion for judgment on the pleadings, the Court may

rely on the pleadings, the exhibits to the pleadings, and any judicially noticeable facts," *Garcia v.*

*Stewart*, 531 F. Supp. 3d 194, 203 (D.D.C. 2021) (alterations and citation omitted), as well as

documents "[i]ncorporat[ed] by reference" into the pleadings that are "integral to" the plaintiff's

claims, *Banneker Ventures, LLC*, 798 F.3d at 1133; *see also Bowden v. United States*, 106 F.3d

433, 437 (D.C. Cir. 1997) (considering "the pleadings and undisputed documents in the record"

while reaching the merits on a motion to dismiss).

   A *pro se* complaint, "however inartfully pleaded, must be held to less stringent standards

than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation

omitted).  "This benefit is not, however, a license to ignore the Federal Rules of Civil

Procedure," *Sturdza v. United Arab Emirates*, 658 F. Supp. 2d 135, 137 (D.D.C. 2009) (citation

omitted), and thus a *pro se* complaint must "still present a claim on which the Court can grant

relief," *Smith v. Scalia*, 44 F. Supp. 3d 28, 36 (D.D.C. 2014) (citations omitted).  Further, if a plaintiff "files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 268 F. Supp. 3d 61, 72 (D.D.C. 2017) (quoting *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003)).

## III.  ANALYSIS

### A.    Discrimination Claims

Liu's Second Amended Complaint alleges that the University discriminated against him on the basis of race, sex, national origin, and age, in violation of Title VII, Section 1981, and the ADEA.  Dkt. 51 at 9–11 (Second Am. Compl. ¶ 12).  The Court will address each claim in turn.

### 1.    *Race Discrimination*

Liu does not assert a race discrimination claim under Title VII, *see* Dkt. 58-1 at 30 n.3, but he does allege the Kroemer engaged in "intentional racial discrimination" in violation of Section 1981, Dkt. 51 at 9 (Second Am. Compl. ¶ 11).  This allegation has three components: First, Liu alleges that Kroemer "depriv[ed]" Liu of "a training opportunity" and "first authorship in the poster" by "gift[ing]" it to Loh.  Dkt. 51 at 9 (Second Am. Compl. ¶¶ 10–11).  Second, he alleges that Kroemer "never consulted" Liu regarding Loh being the first author for the poster, but Kroemer "consulted with Kang" to suggest he allow Loh to be the first author of his study. *Id.* (Second Am. Compl. ¶ 11)  Third, he alleges that Kroemer "deprived [Liu's] first authorship in [his]-generated study," whereas "Kroemer selected a White as the first author in studies that the White played major roles."  Dkt. 51 at 10 (Second Am. Compl. ¶ 12).  According to Liu, all three of these incidents were the product of "intentional racial discrimination" in violation of

"Section 1981."  *Id.* at 9 (Second Am. Compl. ¶ 11).

Section 1981 grants all "persons within the jurisdiction of the United States" the "same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  To state a claim for racial discrimination under Section 1981, "a plaintiff without direct evidence of discrimination as it relates to contractual rights must first plead a *prima facie* case by establishing 'that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class).'"  *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002)).  "A plaintiff can raise an inference of discrimination by showing 'that she was treated differently from similarly situated employees who are not part of the protected class.'"  *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)).

Liu is of Asian descent and is thus a member of a protected class.  Dkt. 51 at 5 (Second Am. Compl. ¶ 1).  But even assuming that Liu's claim "relates to contractual rights" and that these incidents constitute "adverse employment action[s]," *Sessoms*, 774 F.3d at 1022, Liu's claim fails as to the third element:  his allegations do not give rise to an inference of discrimination.

As for the first two incidents, Liu compares himself to Loh and Kang, alleging that he was subjected to worse treatment than them.  But Liu alleges that he, Loh, and Kang are the same race and thus part of the same protected class.  Dkt. 51 at 5–6 (Second Am. Compl. ¶¶ 1–3).  For each, he alleges "race: Asian," and he fails to allege or to argue any separate racial identity.  *Id.*  Comparators, however, must be of a "*different* race," and allegations that the

12

University treated employees of the "*same* race" differently do not support a claim of race discrimination. *Howard v. Fed. Express Corp.*, 316 F. Supp. 3d 234, 243 (D.D.C. 2018) (emphasis in original).

Liu does allege that he is a Chinese descent, while Loh is of Malaysian descent, and Kang is of Korean descent. Dkt. 51 at 5–6 (Second Am. Compl. ¶¶ 1–3). He makes those distinctions, however, in the context of arguing that he was at a comparative disadvantage because it is easier to learn English in Malaysia and Korea than in China, thus explaining why he had greater difficulty communicated in English. *Id.* He does allege, for example, that Kroemer favored Loh and Kang over him because they were from Malaysia and Korea, rather than from China. But even if Kroemer did, that would not solve Liu's problem. As the Supreme Court recognized in *St. Francis College v. Al-Khazaji*, 481 U.S. 604 (1987), Section 1981 prohibits racial discrimination and protects contracting parties from "intentional discrimination solely because of . . . ancestry or ethnic characteristics." *Id.* at 613. It follows that "Section 1981 does not prohibit national origin discrimination *per se*, and a plaintiff must demonstrate that the discrimination is based on 'ancestry or ethnic characteristics,' not on his country of origin, in order to prevail in a section 1981 suit." *Ndondji v. InterPark Inc*., 768 F. Supp. 2d 263, 273 (D.D.C. 2011).

Here, Liu makes no effort to plead such a claim. Instead, he appears rely on the fact that Kroemer is "Caucasian," while he is of Asian descent. Dkt. 51 at 5–6 (Second Am. Compl. ¶¶ 1, 4). But that confuses what it means to discriminate on the basis of race. To allege a claim of racial discrimination, a Section 1981 plaintiff must allege that he was treated less favorably because of his race, and that typically (although not always) requires evidence that a comparator of a different race was treated more favorably. It is not sufficient, however, merely to allege that the plaintiff's supervisor was of a different race, without any factual allegation supporting the

contention that the plaintiff was treated less favorably because of the plaintiff's race.

As for the third incident, Liu does compare himself to an employee of a different race, but he provides no details about this "White" employee that would allow the Court to draw an inference of discrimination.  The Complaint contains no factual allegations even suggesting that this employee was "similarly situated."  *Sessoms*, 774 F.3d at 1022.  Liu has not alleged, for example, that the white employee was also a "Research Specialist" like him with "equivalent qualifications."  *Id.*; *see also Budik v. Howard Univ. Hosp.*, 986 F. Supp. 2d 1, 7 (D.D.C. 2013) (dismissing complaint where plaintiff "fail[ed] to identify the co-worker's job title, or to allege any facts about the co-worker's experience, seniority, or expertise" and "the only information provided [wa]s the co-worker's race").  Nor does Liu allege any facts plausibly suggesting that Kroemer acted with a racially discriminatory motive.

Because there is nothing in the Complaint that "permit[s] the [C]ourt to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, the Court will dismiss this claim.

2.     *Sex Discrimination*

Liu also claims that the University discriminated against him based on his sex in violation of Title VII.  In support of this claim, Liu points to Kroemer's purported decision to "let Loh be the first author in [Liu's]-caused study."  Dkt. 51 at 10 (Second Am. Compl. ¶ 12).  As the University argues—and the Court agrees—it is unnecessary to reach the substance of this allegation because Liu did not exhaust his administrative remedies with respect to this claim. *See* Dkt. 58-1 at 17; Dkt. 55 at 9 (affirmative defenses).

Before filing suit, "Title VII 'complainants must timely exhaust their administrative remedies'" by filing an EEOC charge or, where appropriate, a charge with a state equal employment opportunity office (here, OHR).  *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010)

(quoting *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997)) (alterations omitted).  "In the District of Columbia," a claimant must file a charge with OHR "within 300 days of the date of the allegedly discriminatory/retaliatory act."  *Duberry v. Inter-Con Sec. Sys., Inc.*, 898 F. Supp. 2d 294, 298 (D.D.C. 2012); *see also Cooper v. Henderson*, 174 F. Supp. 3d 193, 202 (D.D.C. 2016) (noting that limitations period is 300 days for complaints filed with state or local agency); *see* 42 U.S.C. § 2000e-5(e)(1).  Even after filing a charge with the EEOC or OHR, however, "a litigant is only entitled to bring a Title VII action in court if []he files it within ninety days after the EEOC gives notice of the right to sue."  *Redding v. District of Columbia*, 828 F. Supp. 2d 272, 279 (D.D.C. 2011) (citing 42 U.S.C. § 2000e–5(f)).  Although the exhaustion requirement is "not jurisdictional," it may be raised as an "affirmative defense," *Clark v. Johnson*, 206 F. Supp. 3d 645, 655 (D.D.C. 2016), and resolved on a motion to dismiss based on "the pleadings and undisputed documents in the record," *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  Moreover, whether a plaintiff has exhausted his remedies with respect to a particular claim turns on whether he included that claim on his charge form.  That is, "[a] plaintiff fails to exhaust administrative remedies where she raises a claim of discrimination based on one protected characteristic through the administrative process but bring[s] a claim based on a different protected characteristic through a federal lawsuit."  *Stevens v. Murphy*, 2020 WL 977971, at *3 (D.D.C. Feb. 28, 2020).

This Court has, accordingly, dismissed claims for failure to exhaust "where plaintiffs have neither checked the correct box" on the EEOC/OHR charge for the type of discrimination alleged "nor given some sort of notice of the substance of their claims in the body of the charge." *Greer v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 297, 307 n.9 (D.D.C. 2015); *see, e.g.*, *Park v. Howard Univ.*, 71 F.3d 904, 907–08 (D.C. Cir. 1995) (holding that plaintiff failed to

exhaust administrative remedies for national-origin hostile work environment claim where her EEOC complaint alleged only national origin and sex discrimination); *Hicklin v. McDonald*, 110 F. Supp. 3d 16, 21 (D.D.C. 2015) (dismissing for failure to exhaust where plaintiff checked the boxes for "race and religion" and "failed to give any notice that he was alleging retaliation in his EEO complaint"); *Jones v. The Wash. Times*, 668 F. Supp. 2d 53, 58 (D.D.C. 2009) (dismissing claim where plaintiff "neither checked the box for discrimination based on age, nor included allegations of age discrimination in the text of her charge").

Here, the University acknowledges that Liu filed an EEOC/OHR charge within the statutory deadline of 300 days from the incident.  Dkt. 58-1 at 18 (citing Dkt. 30-5) (EEOC/OHR charge form); Dkt. 71-1 (letter to OHR); *see also* Dkt. 51 at 4, 11, 13–15, 19–20, 23 (Second Am. Compl ¶¶ 20–21, 30–32, 38) (referencing OHR charge and proceedings).  But as the University correctly observes, Liu "failed to give any notice that he was alleging sex discrimination in his sworn Equal EEOC Charge of Discrimination; rather, he checked national origin and age as the *only* bases of the alleged adverse action."  *Id.* (emphasis in original).  Nor does the written description of the charge, set forth on the form, offer any hint that Liu's complaint included any allegation of sex discrimination:  Liu's narrative "focused solely on [age and national origin] discrimination."  *Id.*; *see* Dkt. 30-5 (describing discrimination "based on [] age and national origin").  Liu, accordingly, did not exhaust his administrative remedies with respect to his sex discrimination claim.

In his opposition brief, Liu responds that he did "exhaust[] [his] sources," but Liu points only to an email he sent to the University offering to settle the case and the fact that he raised sex discrimination in his opposition to the University's prior motion to dismiss.  Dkt. 61 at 5 (citing Dkt. 9).  The Court cannot accept Liu's "conclusory statement[]" that he exhausted his

administrative remedies.  *Iqbal*, 556 U.S. at 686.  Finally, Liu does not suggest that further factual development might provide a basis to excuse his failure to exhaust.  He can hardly argue, for example, that he failed to receive adequate notice of the EEOC/OHR process, since he availed himself of that process and simply failed to mention sex discrimination in his charge.

The Court will, accordingly, dismiss this claim for failure to exhaust.

3.      *National Origin Discrimination*

Liu's allegations of national origin discrimination arise from the same three incidents discussed above: Kroemer (1) denied Liu first authorship of the abstract and poster and permitted Loh to make presentations at two conferences, (2) failed to ask Liu's "consent" "to give up the first authorship to Loh," and (3) terminated Liu's employment.  Dkt. 51 at 10, 16 (Second Am. Compl ¶¶ 12, 23).  Title VII does provide a remedy for discrimination in the terms and conditions of employment based on national origin.  42 U.S.C. § 2000e-2(a)(1).

"Title VII claims may be proved by direct or circumstantial evidence."  *Sun v. D.C. Gov't*, 133 F. Supp. 3d 155, 164 (D.D.C. 2015), *aff'd*, 686 Fed. Appx. 5 (D.C. Cir. 2017).  "An employee has direct evidence of unlawful discrimination if, for example, the employer 'overtly refers' to the employee's protected trait when making an unfavorable employment decision."  *Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 187 (D.D.C. 2018) (alteration and citation omitted).

Here, Liu does not allege any events that, if true, would provide direct evidence of discrimination based on national origin.  The closest that Liu comes is his allegation that Kroemer made these decisions "based on one's spoken English level, not one's contributions to the research (national origin discrimination)."  Dkt. 51 at 8 (Second Am. Compl ¶ 10).  But Liu does not allege that Kroemer ever explicitly referenced any person's spoken English level.  Even

assuming he did, moreover, an employer's references to an "accent" or "language barrier" "do not constitute direct evidence of discrimination on the basis of national origin; rather, such evidence is circumstantial." *Beaver v. McHugh*, 840 F. Supp. 2d 161, 173 (D.D.C. 2012).

In the absence of direct evidence, Liu must rely on circumstantial evidence. Although there are other ways to do so, a circumstantial claim of discrimination typically tracks the following framework: the plaintiff "must allege" that (1) "[]he is part of a protected class under Title VII," (2) "[]he suffered a cognizable adverse employment action," and (3) "the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015); *see also* Dkt. 25 at 8. At the motion to dismiss stage, "a Title VII plaintiff need not plead each element of his prima facie case, but 'must allege facts that, if true, would establish the elements of each claim.'" *Robinson–Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 14 (D.D.C. 2008) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)).

The first two elements pose no barrier for Liu. First, he alleges that he is a member of a protected class because he is of Chinese national origin. Dkt. 51 at 5 (Second Am. Compl. ¶ 1). Second, as explained in the Court's prior opinion in this case, Kroemer's actions related to the authorship dispute are "adverse employment actions" within the meaning of Title VII, *see* Dkt. 25 at 9, and Liu's termination was plainly an adverse employment action, *see Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006) ("firing" constitutes "adverse employment action"). The sufficiency of Liu's Complaint therefore turns on the third element: whether the facts alleged "give[] rise to an inference of discrimination." *Walker*, 798 F.3d at 1091.

One way a plaintiff can create "an inference of discrimination" is "by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (citing *Holbrook v. Reno*, 196 F.3d

255, 261 (D.C. Cir. 1999)).  A plaintiff can aver that another employee was "similarly situated" by pleading that "all of the relevant aspects of his employment situation were *nearly identical* to those of the other employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (alterations omitted and emphasis added) (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999).

"Failure to show that a similarly situated employee outside the same protected class was treated differently generally warrants dismissal of a Title VII disparate treatment discrimination claim." *Black v. Guzman*, 2023 WL 3055427, at *9 (D.D.C. Apr. 24, 2023); *see also Budik v. Howard Univ. Hosp.*, 986 F. Supp. 2d 1, 7 (D.D.C. 2013) (dismissing complaint that failed to "plead[] facts that show that 'all of the relevant aspects of [plaintiff's] employment situation were 'nearly identical,''" to the comparator (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507,  1514 (D.C. Cir 1995))); *Harris v. Mayorkas*, 2022 WL 3452316, at *8 (D.D.C. Aug. 18, 2022) (dismissing complaint that "fail[ed] to plausibly allege similarly-situated comparators"); *Beaulieu v. Barr*, 2019 WL 5579968, at *4 (D.D.C. Oct. 29, 2019) (dismissing complaint that failed to "identify any 'comparator' employees who were treated differently").

As explained below, the Court concludes that Liu has failed adequately to allege that he was treated differently from any similarly situated employee, and accordingly, none of his allegations gives rise to an inference of discrimination.

a.  First Authorship Dispute

Liu first attempts to create an inference of discrimination regarding the authorship dispute by comparing himself to Loh, who, unlike Liu, is of Malaysian descent.  Dkt. 51 at 5, 10 (Second Am. Compl. ¶¶ 1–2, 12).  If Liu plausibly alleges that Kroemer treated Loh more favorably than Liu, despite "all of the relevant aspects" of their "employment situation[s]" being "nearly

identical," that would give rise to an inference of national origin discrimination. *Holbrook*, 196 F.3d at 261.

The Complaint, however, falls short. As the University points out, Dkt. 58-1 at 24, Liu alleges that he and Loh had different job titles, seniority levels, and funding sources. To begin, Loh was a physician. *See* Dkt. 51 at 5 (Second Am. Compl. ¶ 2) ("Katrina Loh, MD"). As a "Medical Fellow" working in Kroemer's lab, Loh was funded by the Children's National Hospital, and she was hired in July 2018. *Id.* Liu, in contrast, was not a physician. He began working as a "temporary" employee in 2017. *Id.* at 5 (Second Am. Compl. ¶ 1). Liu was only hired as a non-temporary "Research Associate" in April 2019, and even that position was a "term appointment" that expired the following year and was subject to a three-month "probationary status." Dkt. 55-2 at 2–3; *see also* Dkt. 51 at 5 (Second Am. Compl. ¶ 1); Dkt. 38-1 at 4. Notably, when Loh presented the poster in "June of 2019," Liu had been working as a non-temporary employee in Kroemer's lab for only about two months. Dkt. 51 at 7–8 (Second Am. Compl. ¶ 9). Loh had been working as a fellow for over a year.

The D.C. Circuit has repeatedly held that employees with different positions or seniority levels are not "similarly situated." *See, e.g.*, *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (comparators were not "similarly situated" to plaintiff where "[n]one of them had the same position he had"); *Holbrook*, 196 F.3d at 262 (FBI "probationary trainee," was not similarly situated to a "fifteen-year FBI veteran"); *Barbour v. Browner*, 181 F.3d 1342, 1345–46 (D.C. Cir. 1999) (two EPA employees with similar job descriptions, but one a GS–12 and the other a GS–13, were not similarly situated); *Burley*, 801 F.3d at 301 (a "conductor," was not similarly situated to an "engineer"); *McKenna v. Weinberger*, 729 F.2d 783, 789–90 (D.C. Cir. 1984) (probationary agency employee was not similarly situated to a permanent employee); *see also*

*White v. Tapella*, 876 F. Supp. 2d 58, 70 (D.D.C. 2012) ("If a comparator employee does not hold the same position as the plaintiff, the comparator is not similarly situated.").  Liu fails to explain how his status as a "probationary" Research Associate hired in April 2019 was "nearly identical" to Loh's status as a physician and Medical Fellow hired in 2018.  *Holbrook*, 196 F.3d at 262; *see* Dkt. 58-1 at 24.

Moreover, the Complaint suggests that Liu and Loh were not similarly situated for another reason:  they made different contributions to the abstract and poster.  As for the poster, Liu indicated his contributions by annotating a copy and attaching it to his first amended complaint, *see* Dkt. 7-4, asserting that the "boxed figures are [his] results," Dkt. 51 at 8 (Second Am. Compl. ¶ 9) (referencing Dkt. 7-4).  But of the *seventeen* figures on the poster, Liu "boxed" only *four*.  *See* Dkt. 7-4.  In other words, Liu alleges that fewer than one quarter of the figures on the poster are "his."  Liu fails to provide details regarding Loh's job duties that would allow the Court to compare them, but the University argues that Loh presented the abstract and poster because she was the one who "wrote" them.  Dkt. 58-1 at 10, 25 (citing Dkt. 55-1 at 8).[5]  Liu does not contest that Loh wrote the abstract and poster text.  *See* Dkt. 61 at 2.

To be sure, Liu alleges that his contributions to the study were "major" and that he was the "designer."  Dkt. 51 at 7–8 (Second Am. Compl. ¶¶ 8–9).  Liu further contends that he

---

[5] The University cites the University Research Integrity Committee's investigation report for support, Dkt. 55-1.  Liu does not reference this document in his operative complaint but excerpted it and attached it his first amended complaint.  *See* Dkt. 7-6; *see also* Dkt. 61 at 4 (opposition to motion for judgment on the pleadings) (citing Dkt. 7-6); *cf. Brown v. Whole Foods Mkt. Group, Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (holding that district courts "should . . . consider[] the facts alleged in *all* of [a pro se plaintiff's] pleadings" and "in light of all filings") (emphasis in original).  According to the University, Liu filed a complaint against Loh with the University Research Integrity Committee.  Dkt. 55 at 4 (Am. Answer ¶ 10).  The Committee, however, concluded that "Liu's allegations do not meet the definition of research misconduct as stated in the Code," because "authorship disputes are not treated as research misconduct."  Dkt. 7-6 at 1.

"measur[ed] weights of the three cohorts of mice every week," "performed diabetic tests," and "immune blots." *Id.* at 7 (Second Am. Compl. ¶ 8).  But in light of the manifest differences between Liu and Loh's employment situations and between their respective contributions to the study at issue, the Court concludes that Liu has failed to allege that he and Loh were similarly situated when Kroemer allegedly decided to make her first author.  Thus, even accepting the truth of Liu's factual allegations, as the Court is required to do at this stage of the proceeding, they do not give rise to a plausible inference of discrimination.

The Court, accordingly, concludes that Liu has failed to plead facts giving rise to an inference of national origin discrimination based on this incident.

        b.     <u>Failure to Obtain Liu's Consent for Loh to be the First Author</u>

Liu next alleges that Kroemer discriminated based on national origin when he allegedly did not ask for Liu's "consent" before allowing Loh to present the abstract and poster.  Dkt. 51 at 10 (Second Am. Compl. ¶ 12).  Liu points to Kang, whose national origin is "Korea," as a comparator.  *Id.* at 5–6 (Second Am. Compl. ¶ 3).  Liu alleges that "Kroemer asked Kang's consent" to let Loh be the first author of Kang's study yet denied Liu the same courtesy.  *Id.* at 10 (Second Am. Compl. ¶ 12).

This claim fails for the same reason as his first claim:  Liu does not sufficiently allege that he and Kang were similarly situated.  While Liu was a "probationary" Research Associate hired for that position in April 2019, Kang was hired as a "Research Assistant" two years earlier, in 2017.  Dkt. 51 at 5–6 (Second Am. Compl. ¶ 3).  Unlike Liu, Kang was "paid by Kroemer's R1 funding, which supports human research."  *Id.*  Once again, these differences in job title, seniority, and funding sources make Kang an inapt comparator.

Not only are there differences between Liu's and Kang's respective positions, but there

are no facts indicating that Liu and Kang were similarly situated with respect to the specific

incidents.  If the Complaint had alleged, with sufficient detail, that Liu and Kang made equal

contributions to their respective studies and that Kroemer asked for only Kang's consent, that

might have (subject to the differences in tenure and position discussed above) strengthened the

inference that Kroemer acted with a discriminatory motive.  But the Complaint contains no

factual allegations regarding Kang's study at all, let alone facts suggesting that Liu and Kang did

equal work on their studies.  Accordingly, there is no indication that Kang was treated "more

favorably in the same factual circumstances."  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490,

495 (D.C. Cir. 2008).

      Liu merely alleges that, by consulting Kang and not Liu, Kroemer was "discriminating

[based on] national origin," Dkt. 51 at 10 (Second Am. Compl. ¶ 12), but this is precisely the

type of "formulaic recitation of a cause of action's elements" the Supreme Court has said cannot

survive a motion to dismiss, *Twombly*, 550 U.S. at 545.

      Liu's allegations fail to give rise to an inference of national origin discrimination as to

this incident.

            c.    <u>Termination</u>

      Finally, Liu alleges that he was discharged on account of his national origin.  Dkt. 51 at

16 (Second Am. Compl. ¶ 23).  Liu again compares himself to Kang, asserting that they both

"complained" to Kroemer that they felt uncomfortable with Loh being the first author of their

respective studies.  *Id.*  Liu explained that Kang "is still hired, whereas [Liu] has been fired."  *Id.*

      In the context of a claim of discriminatory discipline, "to be successful in the use of

comparator evidence, 'the plaintiff must point to a *similarly situated* employee outside of a

protected class who committed comparable offenses but who was punished less severely by the

same deciding official.'" *See Sledge v. D.C.*, 63 F. Supp. 3d 1, 17–18 (D.D.C. 2014) (emphasis in original) (quoting *Tapella*, 876 F. Supp. 2d at 70); *Dodson v. United States Capitol Police*, 633 F. Supp. 3d 235, 254 (D.D.C. 2022) ("Factors that bear on whether someone is an appropriate comparator include, . . . in cases involving discipline, the similarity of their offenses.") (internal quotation marks and citation omitted).

As explained above, however, Liu does not plausibly allege that he and Kang were similarly situated.  And "'[i]n the absence of evidence that the comparators were actually similarly situated' to [plaintiff], an inference of falsity or discrimination is not reasonable." *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 995–96 (D.C. Cir. 2002).

In addition, even if the Court were to assume they were similarly situated, Liu does not allege that they committed comparable offenses.  While both "complained" to Kroemer about Loh being the first author, Liu readily concedes that he committed a variety of other transgressions, including failing to complete his lab duties, using incorrect reagents, and sleeping at his desk.  Dkt. 51 at 12 (Second Am. Compl. ¶ 15) (admitting to, among other things, "taking a nap on my desk").  Liu's termination letter further explains that Liu's "three-month probationary period ending July 8, 2019 was not successful."  Dkt. 7-8 at 1; Dkt. 55-4 (same); Dkt. 51 at 11 (Second Am. Compl. ¶ 13) (referencing termination letter).  Liu's "Poor Work Performance" included "mislabeling of samples, missing mouse weighs for 2 weeks, attributing NOD 2 evaluation results to the incorrect patient, performing experiments with incorrect reagents, and evidence of [Liu] sleeping at [his] desk."  Dkt. 7-8 at 1.  Liu's "Unprofessional Conduct" included an "aggressive communication style with other lab members."  *Id.*  Liu's Complaint, however, contains no allegations regarding whether Kang committed similar offenses

24

or was even accused on any other misconduct of any type.

Liu's Complaint, accordingly, does not give rise to an inference that he was terminated because of his national origin.

4.     *Age Discrimination*

Liu also brings a claim of age discrimination under the ADEA. This claim arises from the same incidents giving rise to his Title VII claims—that is, Loh's presentation of the abstract and poster, Kroemer's failure to seek Liu's consent for Loh to present these items as first author, and Liu's termination. *See* Dkt. 51 at 10, 16 (Second Am. Compl ¶¶ 12, 23). Liu alleges that Kroemer was "discriminating in age" by taking these actions against him. *Id.*

The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). There are accordingly two elements to an ADEA discrimination claim: the plaintiff must allege "(1) that [she] 'suffered an adverse employment action' and (2) that [her] employer took that action 'because of' [her] age." *Sagar v. Mnuchin*, 305 F. Supp. 3d 99, 108 (D.D.C. 2018) (quoting *Brady*, 520 F.3d at 493). Courts "generally apply the same approach in ADEA cases" as "in Title VII cases." *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014).

Unlike Title VII, however, the ADEA does not provide for compensatory or punitive damages as remedies. *Miller v. Kerry*, 924 F. Supp. 2d 133, 138 (D.D.C. 2013) ("It is well-established that compensatory damages are not available under the non-federal employer provisions of the ADEA."); *Spaeth v. Georgetown Univ.*, 839 F. Supp. 2d 57, 65 (D.D.C. 2012) ("[T]he overwhelming weight of legal authority indicates that compensatory and punitive damages are not available under the ADEA.") (internal quotation marks and citation omitted);

25

*see also Comm'r of Internal Revenue v. Schleier*, 515 U.S. 323, 326 & n.2 (1995) ("[T]he Courts of Appeals have unanimously held . . . that the ADEA does not permit a separate recovery of compensatory damages for pain and suffering or emotional distress." (collecting cases)). Instead, "the ADEA generally permits plaintiffs to seek reinstatement, backpay, or injunctive or declaratory relief." *Seed v. Env't Prot. Agency*, 100 F.4th 257, 263 (D.C. Cir. 2024). Section 626(b) also authorizes liquidated damages for "willful" violations of the statute.[6] 29 U.S.C. § 626(b).

The University points out—and Liu does not contest, *see generally* Dkt. 61—that Liu does not seek liquidated damages, "reinstatement, backpay, or injunctive or declaratory relief," *Seed*, 100 F.4th at 263; Dkt. 58-1 at 20. He seeks only "compensatory and/or punitive damages"—neither of which is available under the ADEA. Dkt. 51 at 23 (Second Am. Compl. ¶ 39); *id.* at 10-11, 17 (Second Am. Compl. ¶¶ 12, 26–27).

A plaintiff lacks Article III standing to pursue an ADEA claim where the statute does not provide any remedies. *See Seed*, 100 F.4th 263–64; *Spaeth*, 839 F. Supp. 2d at 65. But in light of Liu's *pro se* status, the Court will construe his complaint as seeking any remedy available to him.

---

[6] The ADEA does not explicitly authorize nominal damages as a remedy, and the handful of district courts that have addressed the issue have come out different ways. *Compare Younger v. D.C. Pub. Schs.*, 325 F. Supp. 3d 59, 62 (D.D.C. 2018) (holding that nominal damages may be recovered), *with Beverly v. Desmond Hotel & Conf. Ctr.*, 2004 WL 163498, at *4 (E.D. Pa. Jan. 23, 2004) (concluding that Congress decided "not to provide for the recovery of nominal damages under the ADEA"). The Court need not decide this issue, however, given that Liu neither seeks nominal damages nor responds to the University's argument that they are unavailable under the ADEA. *Compare* Dkt. 58-1 at 21, *with* Dkt. 62; *see Xenophon Strategies, Inc. v. Jernigan Copeland & Anderson, PLLC*, 268 F. Supp. 3d 61, 72 (D.D.C. 2017) (explaining that a "court may treat those arguments that the plaintiff failed to address [in his opposition] as conceded") (internal quotation marks and citation omitted.

a.    Authorship dispute and failure to seek consent

As to the first two incidents—Loh's presentation of Liu's data and Kroemer's failure to

seek Liu's consent for her to do so—the Court concludes that the ADEA does not provide any

remedies and so Liu lacks standing to pursue this claim.  Backpay is not available because

backpay "consists of 'the difference between what the employee would have earned but for the

wrongful discharge and [her] actual interim earnings.'"  *Seed*, 100 F.4th at 264 (quoting *Oil,*

*Chem. & Atomic Workers Int'l Union v. NLRB*, 547 F.2d 598, 602 (D.C. Cir. 1976)).  But these

incidents did not lead to Liu's "discharge," and he does not otherwise allege that he suffered a

concomitant reduction in compensation or benefits (for which backpay might be available).  *See*

*id.* (denying backpay where the plaintiff did not identify "any difference in earnings or benefits"

stemming from the adverse employment action).

Nor is reinstatement, injunctive, or declaratory relief available.  As noted above, these

incidents did not involve Liu's "discharge," which is "a necessary element of a claim for

reinstatement."  *Seed*, 100 F.4th at 264 (quoting *Taylor v. FDIC*, 132 F.3d 753, 767 (D.C. Cir.

1997)).  Liu cannot seek injunctive or declaratory relief because he does not allege that he is

likely to return to Kroemer's lab, where he would possibly suffer age discrimination in the

future.  As a result, there is no "present harm left to enjoin," *id.* at 265 (quoting *Taylor v. Resol.*

*Tr. Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995)) (alteration omitted), and "no case or controversy

of 'sufficient immediacy and reality' . . . to allow a declaratory judgment,'" *id.* (quoting *City of*

*Los Angeles v. Lyons*, 461 U.S. 95, 104 (1983)).

b.    Termination

The third incident—Liu's discharge—does not pose the same problem as to remedies.

Discharge, of course, always results in a reduction in compensation or benefits, and so Liu would

at least be entitled to backpay.  *See Seed*, 100 F.4th at 264.  Accordingly, Liu's claim may proceed so long as his allegations create an inference of discrimination.

As in the Title VII context, a plaintiff may create an inference of age discrimination by pleading that "he was disadvantaged in favor of a similarly situated younger employee." *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 22 (D.D.C. 2004).  Liu again attempts to create this inference by comparing himself to Kang:  "Dr. Kang (Korean, not to 40 in 2019), complained as I (Chinese, 64 in 2019) did: uncomfortable for Loh to be the first author in his study, he is still hired, whereas I have been fired."  Dkt. 51 at 16 (Second Am. Compl. ¶ 23).

This claim fails for the same reason Liu's Title VII claims fail.  As explained above, not only were Liu and Kang not similarly situated, but they did not commit comparable offenses.  In the absence of factual allegations that Liu was discharged "in favor of a similarly situated younger employee," *Mianegaz*, 319 F. Supp. 2d at 22, Liu's discriminatory discharge claim must be dismissed.

## B.    Retaliation Claims

Liu's retaliation claims are premised on two events: (1) his discharge in June 2019, and (2) the University's failure to respond to his requests for his data 16 months following his discharge.  Dkt. 51 at 15–16, 18–20 (Second Am. Compl. ¶¶ 23, 28–31).  Liu's First Amended Complaint invoked the D.C. Human Rights Act, D.C. Code § 2–1401.01 *et seq.*, which he invokes again here, in addition to Section 1981, Dkt. 51 at 19–20 (Second Am. Compl. ¶¶ 30–33).[7]

---

[7] Liu also invokes the retaliation provision of the D.C.'s wage laws, D.C. Code § 32-1311.  *See* Dkt. 51 at 17 (Second Am. Compl. ¶ 27).  But he does not make any allegations regarding his wages, and so the Court, like the University, will construe his claim as arising under the retaliation provision of the D.C. Human Rights Act, D.C. Code § 2–1401.61.  Similarly, Liu

To establish a prima facie case for retaliation under the D.C. Human Rights Act § 2-1402.61(a), Liu must allege: (1) that he was engaged in a statutorily protected activity, (2) that he suffered a materially adverse action from their employer, and (3) that there is a causal connection between the two.  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); *see also Cole v. Boeing Co.*, 75 F. Supp. 3d 70, 83 (D.D.C. 2014) ("[R]etaliation claims under the DCHRA are analyzed using the same legal framework as federal retaliation claims [under Title VII].").  Similarly, "[t]o establish a retaliation claim under Section 1981, a plaintiff must show that he engaged in protected activity—such as filing an EEOC complaint—and that his employer took an adverse employment action against him because of that activity."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 578 (D.C. Cir. 2013).

1.    *Retaliatory Discharge*

The Court previously concluded that Liu's first amended complaint did not state a claim of retaliatory discharge, holding that the analysis "begins and ends with the first element, a statutorily protected activity."  Dkt. 25 at 17.  Nothing has changed in this regard.

Liu repeats his allegation that he was terminated because he sent an email to Kroemer expressing that he was "very uncomfortable" with Loh's presentation of "[his] results without [his] consent."  *Compare* Dkt. 51 at 11 (Second Am. Compl. ¶¶ 13–14) ("GU terminated my position because of my complaint."), *with* Dkt. 8 at 9 (Am. Compl. ¶¶ 13–14) (same).  As before, Liu fails to identify a statutorily protected activity.  Liu's "complaint email," which he cites in his operative complaint as an exhibit, Dkt. 51 at 11 (Second Am. Compl. ¶ 13) (citing Dkt. 7-7),

---

invokes 42 U.S.C. § 2000-e2(n)(2)(C).  *See, e.g.*, Dkt. 51 at 17 (Second Am. Compl. ¶ 27).  As the University argues—and the Court agrees—that statute governs "employment practices implementing consent judgments or orders."  42 U.S.C. § 2000-e2(n); *see* Dkt. 58-1 at 34 n.6.  Accordingly, it is inapplicable to Liu's claims.

did not complain about any conduct prohibited by the D.C. Human Rights Act or Section 1981.

Instead, the email that Liu alleges caused his termination merely objects to Loh receiving credit

for Liu's work, "without [his] consent," and observes:  "I have no idea what was her abstract and

what data was presented."  Dkt. 7-7 at 1.  "Objections of this type, unconnected to any asserted

violation of the antidiscrimination laws, do not amount to statutorily protected activity."  Dkt. 25

at 18.

 The Court, accordingly, concludes that Liu has again failed to state a claim for retaliatory

discharge.

  2. <u>Post-Termination Retaliation</u>

 Liu's second retaliation claim—that the University retaliated against him by failing to

respond to his request for data—fares no better.  The first element poses no barrier to this claim:

As the University concedes, Dkt. 58-1 at 35–36, Liu has sufficiently alleged that he engaged in a

statutorily protected activity.  Liu filed a complaint with the OHR in July of 2019, alleging

national origin and age discrimination, *see* Dkt. 51 at 19 (Second Am. Compl. ¶ 30) (referencing

"the intake of materials by Office of Human Right"); Dkts. 30-5 (charge form), 71-1 (letter to

OHR).

 But Liu stumbles when it comes to the second element.  As the Court has previously

explained, "to the extent that Liu intends to claim that the University ordinarily would have

provided him with access to the data that he generated while employed in Kroemer's lab, but that

it refused to do so because Liu had filed a complaint with the OHR," he needs to allege facts

sufficient to "put the University on reasonable notice of such a claim."  Dkt. 25 at 20.  In his

most recent Complaint, Liu does not remedy this flaw.  The Complaint includes no factual

allegations that might support an inference that Liu had a legal or contractual right to the data

that he generated as an employee working in Kroemer's lab or that, as a matter of practice, a Research Specialist or Research Associate is typically allowed to take the data that he generated while working in the lab, after he leaves.  Nor has he alleged any facts that might support a reasonable inference that he was denied such a right or common privilege based on his protected activity.

Rather than address these deficiencies in his prior complaints, Liu merely avers in conclusory terms that that "that his right to use [his]-caused data is a protected privilege as the Court's analysis in ECF 25."  Dkt. 51 at 20 (Second Am. Compl. ¶ 31).  But that allegation merely refers back to this Court's observation that Liu might have been able to state a claim for retaliation if he had alleged that "the University ordinarily would have provided him with access to the data that he generated while employed in Kroemer's lab, but it refused to do so because Liu had filed a complaint with the OHR."  Dkt. 25 at 20.  In order adequately to allege such a claim, however, Liu needed to do more than simply refer back to the Court's prior opinion.  He had to allege *facts* that would support the contention that Universities—including Georgetown University, in general, and Kroemer's lab, in particular—typically allow former employees to take data with them when they leave.  Without any such detail, Liu's allegations are insufficient to support a plausible inference that Liu (unlike other similarly situated, former employees) was denied access to the data at issue in retaliation for engaging in protected activity.

The Court will, accordingly, dismiss Liu's claim for retaliatory denial of access to the data.

## C.      Fraud and Litigation Misconduct Claims

Liu devotes substantial portions of his Complaint to accusing the University of

engaging in "fraud" by "falsifying evidence" regarding the reasons for his termination.  *See* Dkt. 51 at 12–16 (Second Am. Compl. ¶¶ 16–22) (arguing that the University has "add[ed]" "falsified reasons" for Liu's termination).  In response, the University "recognizes that . . . the Court must accept Plaintiff's factual allegations as true," but given "the seriousness of the allegations," the University "denies having 'falsified' evidence or 'cheated.'"  Dkt. 58-1 at 33 & n.5.

The Court need only briefly address these allegations for two reasons.  First, Liu does not assert a claim premised on the falsification of records or cheating.  Second, Liu's own exhibits, which he cites in support, contradict his accusations.  Liu alleges, for example, that in the parties' Joint Rule 26(f) and Local Rule 16.3 Report, Dkt. 36, and the University's Position Statement to OHR, Dkt 38-1, the University added post-hoc rationales for his termination to cover up the "true reason[]" for his firing—namely, "retaliation."  Dkt. 51 at 12–13 (Second Am. Compl. ¶¶ 16–19).  But all of the reasons that the University allegedly "added" appear in its original termination letter, which Liu attached to his First Amended Complaint and incorporates by reference into his operative Complaint.  *E.g.*, Dkt. 51 at 11 (Second Am. Compl. ¶ 13) (citing Dkt. 7-8).  For example, Liu suggests that (1) his failure "to check on the weight progress of mice," (2) "rais[ing] his voice" at other lab members, (3) failure to improve his performance upon verbal counseling, are all "new" or "falsified" reasons that did not appear in his termination letter.  *See id.* at 13 (Second Am. Compl. ¶ 17) (citing Dkts. 36, 38-1).  But all three of these reasons (and more) are set forth in the termination letter.  *See* Dkt 7-8 (explaining that reasons for termination were, among other things, "missing mouse weights for two weeks," exhibiting "an aggressive communication style" with coworkers, and "fail[ing] to improve" despite "verbal counseling").

Liu also makes much of the fact that, in its Position Statement to OHR, Dkt. 38-1 at 6, the University allegedly misstated the date of the lab meeting during which Liu "raised his voice" to the lab manager, *see* Dkt. 51 at 14 (Second Am. Compl. ¶ 20) (arguing that "Defendant swapped the lab meeting date").  The University stated that the meeting occurred on May 18, 2019, while Liu contends that it occurred on June 14, 2019.  Liu suggests that the University did this deliberately to hide "Dr. Kroemer's retaliation motive."  Dkt. 51 at 14 (Second Am. Compl. ¶ 20).  His logic, however, is difficult to follow; even assuming that Liu is correct as to the date, that error does not change the fact that Liu was not engaged in a protected activity when he was terminated and thus could not have been the victim of a retaliatory discharge.  If anything, Liu's assertion that the lab meeting where he raised his voice occurred on June 14, 2024—*closer* to the date of his termination—weakens the inference that he was terminated because of his "complaint" email earlier that month.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** the University's motion for judgment on the pleadings, Dkt. 58.

A separate order shall issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 30, 2024